UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PRISCILLA RAINEY, | ) | |
| | ) | |
| Plaintiff, | ) | 15 C 6844 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| JAYCEON TERRELL TAYLOR, a.k.a. The Game, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Priscilla Rainey brought this diversity suit against Jayceon Terrell Taylor, alleging sexual battery. Doc. 1. After a one-week trial, the jury returned a verdict in Rainey's favor in the amount of $7,130,100.00, and judgment was entered. Docs. 139-140. Taylor moves under Civil Rule 59 for a new trial or a remittitur. Docs. 151, 158. The motion is denied.

**Background**

The complaint, filed in early August 2015, alleged the following. Rainey was cast as one of several female contestants on a VH1 reality television show called *She's Got Game*, a production essentially patterned on *The Bachelor*, with Taylor, a rap artist who performs under the stage name "The Game," as the male lead. Doc. 1 at ¶¶ 6-7. In May 2015, while the show was filming in the Chicago area, Taylor took Rainey on an off-camera date to Adrianna's Sportsbar in Markham, Illinois. *Id*. at ¶¶ 8-9. Taylor sexually battered Rainey that night, including by reaching his hand inside her dress to rub her bare vagina and buttocks in front of a crowded room of onlookers. *Id*. at ¶ 9.

At status hearings in early October 2015 and early November 2015, Rainey's attorney reported on his unsuccessful efforts to serve Taylor. Docs. 10-11. In December 2015, Rainey

moved to approve alternative service after five process servers in three States—one of whom tried forty-one times to personally serve Taylor at his home—could not effectuate service. Doc. 17 at ¶¶ 6, 14. The court granted the motion, ruling that if Taylor "does not answer or otherwise plead to the complaint within the required time frame, the court will enter a default under Civil Rule 55(a) and will proceed to a prove-up hearing under Civil Rule 55(b)." Doc. 19. Taylor did not answer or otherwise plead during the required time frame, and so the court entered a Rule 55(a) default on February 1, 2016, stating:

> I've given the defendant plenty of opportunity to appear in this case. The plaintiff established that the defendant was evading service, so I issued an order allowing for alternative service, and there were about three belts and two pairs of suspenders in that order. And the alternative service was completed by early in the month of January. And the defendant certainly knows about this case. There's been a lot of chatter about it on social media, and I just can only assume, based on the lack of a response [in court], that the defendant knows about the case, has been served with alternative service with summons and the complaint, and has … elected not to respond.

Doc. 24.

Taylor's counsel, Andrew Williams of Florida, appeared ten days later, Doc. 26, and shortly thereafter moved to quash service and set aside the default, Doc. 37. On February 24, 2016, the court denied the motion to quash, reasoning that the record "paint[s] a very clear and unmistakable picture of the plaintiff's dogged efforts at service and how she was foiled at effecting service"; but the court vacated the default and set trial for November 14, 2016. Doc. 44. After Taylor answered, the case was referred to the Magistrate Judge, Docs. 48-49, who set a settlement conference for June 16, Doc. 56 ("The parties and their counsel must personally appear for the settlement conference.").

On June 2, Taylor moved to reset the settlement conference. As one ground for the continuance, Taylor stated:

> This past Memorial Day Weekend sadly almost 70 people were shot in the city of Chicago. Due to high volume of violence and likelihood of reprisals due to such violence the Defendant has grave concerns for his safety and for those who assist him during his travels due to his celebrity status.

Doc. 60 at ¶¶ 4-5. The next day, the Magistrate Judge cancelled the settlement conference, but cautioned the parties "that their trial date on 11/14/2016 is a firm date that will not be extended." Doc. 62; *see also* Doc. 63 (Magistrate Judge advising the parties "that the Court previously granted the unopposed motion to reset the settlement conference only because the parties were in agreement that 'a more meaningful and productive Settlement Conference will be possible' if they delay the conference until after certain depositions take place"). At the next status hearing before the District Judge, Doc. 64, the court expressed to Williams great skepticism regarding Taylor's motion:

> Unless your client was going to be staying in North Lawndale or East Garfield Park or Englewood, I don't think he was going to have any problem with violence in the Chicago area. Not many people are knocked off in a Town Car from O'Hare to the Four Seasons. So, you know, when I read that, it just struck me as a huge joke, and the only thing you accomplish by doing that is hurting your own credibility and your client's credibility with the court. So, I'd encourage you to keep that stuff to a minimum, if not eliminate it entirely.

On July 5, Taylor moved under 28 U.S.C. § 1404(a) to transfer the case to the Central District of California or the Southern District of Florida. Doc. 67. The court denied the motion for several reasons, including that a transfer would delay trial. Doc. 81. On September 22, Williams orally moved to continue the trial; the court denied the motion "without prejudice to the … defendant making a more persuasive and compelling showing in writing." Doc. 82. More

than three weeks later, on October 14, Taylor renewed his motion to continue the trial. Doc. 88.

In denying that motion, Doc. 95, the court stated:

> [T]he parties have known since February 24th of the November 14th trial
> date. And let me say this: Even though the trial date was set eight-and-a-half
> months [in advance] and there was all this time for discovery, if the defendant
> had demonstrated that the defendant was diligent in pursuing discovery and
> that despite his best efforts the nearly nine months of time was not sufficient
> to take the discovery that was necessary and to prepare for trial, then a
> continuance might have been in order. But based on the materials that have
> been submitted, the defendant has not made that showing.
>
> Let me start with a global observation. The defendant has—although
> defendant has local counsel, really, one attorney has been doing everything,
> Mr. Williams. And there's … nothing in theory wrong with proceeding with
> one attorney doing everything, but there are consequences of that choice. The
> fact that there was just one attorney doing the work … is the product of the
> defendant's own choice of how he was going to handle the case. And it may
> be that having one attorney assigned to do the substantive work on this case
> resulted in the defendant understaffing this case legally. And it may be that if
> the defendant had two or three attorneys working substantively on the case,
> what needed to get done in the past few months would have gotten done.
> What can't happen is the defendant [chooses] to have just one attorney handle
> a matter substantively, have that … result in an understaffing in the case
> where one attorney can't get everything done that needs to get done, and then
> come into court a month before the trial date and say, well, we're behind in
> discovery; I haven't been able to do everything that I wanted to do, and,
> therefore, I should get a continuance. …
>
> With respect to the particular items of discovery that remain outstanding, the
> record that's in front of me does not establish that the defendant acted with the
> requisite diligence. … There's sufficient time, given what needs to be
> done … . We have three weeks until trial, which is more than enough time for
> that discovery to take place and for trial preparation to occur.

The jury trial began, as scheduled, on Monday, November 14. Doc. 130. Taylor was not

present that day, but Williams informed the court that although Taylor would not be present for

jury selection, he "will be here tomorrow." As Williams explained days later, Taylor did not

believe it necessary to appear for the first day of trial because professional basketball star

Derrick Rose, as a defendant in his own civil sexual assault case in the Central District of

California, did not appear for the first day of *his* trial. The difference between Rose's and

4

Taylor's circumstances—apart from the fact that Rose had a preplanned obligation the first day of trial, the preseason opener in Houston—is that Rose sought and obtained in advance the judge's permission for missing the first day of trial. *See* Transcript of Telephonic Status Conference at 20-23, *Doe v. Rose*, No. 2:15-cv-07503-MWF-JC (C.D. Cal. Oct. 3, 2016) (Dkt. 412) (noting that the conflict was "not a surprise" to the court or plaintiff's counsel and declining to "force [Rose] to miss the game"); Michael McCann, *Legal Strategies for Derrick Rose, Accuser Ahead of Rape Civil Trial*, Sports Illustrated (Oct. 4, 2016), https://www.si.com /nba/2016/10/04/derrick-rose-rape-trial-civil-lawsuit-knicks-adidas-analysis. By contrast to Rose, Taylor had no professional obligation the first day of trial and, making matters worse, simply took it upon himself to be absent.

When trial resumed on Tuesday, November 15, Williams notified the court that Taylor would not be present that day and made an oral motion for a continuance. Williams represented that Taylor had called an "emergency dental hotline" at approximately 6:00 p.m. on Sunday, November 13 and had undergone emergency "dental surgery" in Los Angeles on November 14. Williams invited the court to call the dental professional who performed Taylor's procedures. During that call, the professional (assuming that is who was on the line, as no one was under oath) stated that he performed "basically more or less a root canal procedure, two of them" on November 14, and that he typically follows up with patients "in a couple of weeks." He also stated that he "wouldn't have recommended" that Taylor fly on the day of his procedure because altitude change can cause pain. No affidavit or declaration from Taylor or the dental professional was presented.

To assist in evaluating the veracity of Taylor's story, Rainey's counsel presented the court with screenshots from Taylor's Snapchat account. The account has a post showing Taylor

smoking (something) in a dark room with flashing pink lights at 2:44 a.m. Pacific time the

morning of Monday, November 14.

The court denied Taylor's motion for a continuance and stated its reasons on the record.

Doc. 132. Those reasons included:

> From what it looks like, [Taylor] was out partying. … And the fact that he
> was out partying on a Sunday night and early Monday morning, that's very
> odd for somebody with a trial in Chicago at 9:30 in the morning on Monday
> morning. I've never had a case—and I've tried maybe 36 cases over here—
> I've never had a case where a party did not appear for his or her own trial,
> whether plaintiffs or defendants. Voir dire is part of the trial, and we could
> very well have had openings yesterday. This is indicative of somebody who
> had no intention of appearing at trial. It's certainly very odd for somebody
> who called in a dental emergency [on] Sunday at 6:00 p.m. Surgery happened
> during the day on Monday from 10:00 to 2:00, and neither the Defendant nor
> his people bothered to call his attorney, who was here trying the case in
> Chicago. Again, that's indicative of somebody who had no intention of
> appearing in the first place. … Maybe Mr. Taylor has a room at his house with
> flashing pink lights where he smokes. But from what it looks like, he was out
> partying on Sunday night and Monday morning.
>
> And then we have the backdrop. Throughout this case, throughout this
> litigation, Mr. Taylor has not taken this case seriously and has engaged in
> avoidance behavior, and that's putting it nicely and mildly. He evaded service
> for months, resulting in my approval of alternative service and a default. And
> all during that time, he knew about the case, and we know that he knew about
> the case because he was talking about it on social media, and he was still
> evading service. Then he filed a motion to cancel the settlement conference
> here in Chicago in June, and with a wholly non-credible excuse. … That story
> he gave about being concerned for his safety if [he came] to Chicago was
> utterly ridiculous, and it was more avoidance behavior from him. Then a
> month later, four months before trial, he moved to transfer the case, because
> he knew we had a trial date. He knew that it was set. He wanted to move it to
> another venue in order to get a later trial date. Then, a month before trial, he
> moved for a continuance, more avoidance behavior. And I talked about, when
> denying that motion, the fact that Mr. Taylor did not put together a legal team
> that would have allowed him to do the things that he needed to do to get this
> case ready for trial in the nine months since I set this case for trial. …
>
> From all of this, from everything I've just said, by far the most likely
> conclusion and perhaps the only reasonable conclusion is that Mr. Taylor's
> current absence is more of the same, that it's voluntary, and that he had no
> intention of appearing at trial. And there's been no showing that Mr. Taylor
> absolutely needed that surgery on Monday, particularly given that he called it

6

in on Sunday at 6:00 p.m., and then, from what we can tell at this point, went
out partying that evening and into the morning. So, for those reasons—and
again, I'm basing this on the information that I have at this particular point in
time, and I've been provided nothing else—I'm going to deny the motion for a
continuance, and we're going to proceed at trial.

The next day, Wednesday, November 16, Taylor's attorney presented the court with

printed copies of airline and hotel reservations, and renewed the motion for a continuance. The

court denied the motion on the record:

The reservation—it says that there's a reservation that he's going to leave
L.A. at 11:25 Monday night and arrive 5:12 a.m. on Tuesday morning
[November 15th], which is a day after the trial was going to start; and then it
has him returning at 7:50 p.m. on Wednesday, November 16th and arriving in
L.A. at 10:23 p.m. on Wednesday, November 16th, … after I had been
informed by both lawyers last week that this case was actually going to take
more than the four or five days that I had been told. …

None of this makes sense. It doesn't even address the flight issue. But even if
the flight issue were addressed, we have everything else, which is: Did he
really need to be in L.A. for this dental surgery? If it was such a serious,
serious dental emergency, why was he out partying all night Sunday night and
Monday morning? … So, I'm questioning the legitimacy and the seriousness
of the dental issue. Even if it was a serious and legitimate dental issue, why
didn't he tell you until Monday night? … [T]here is no answer. So, the
motion for a continuance is still denied for all the reasons that I've given.

As to the flight and hotel reservations, which were shown to the court but which Williams did

not make part of the record, the court stated:

There's two men; two women; one hotel room at the Kimpton that was
booked. Again, this demonstrates what I have been suspecting, which is they
did not intend to come out, because if they had intended to come out with two
men and two women, with first class flights costing $1300 a seat, they
wouldn't have skimped [by] shoving everybody into one hotel room. They
have one hotel room booked, arriving on Monday and departing on
Wednesday. So, this is a ruse. It's a really, really poor ruse and a really,
really transparent ruse, but it's a ruse nonetheless. So, this travel information
doesn't even cure the travel part of the multi-faceted reason why I have denied
the motion for a continuance.

7

Later that day, Williams raised the issue of Taylor's travel reservations again:

>MR. WILLIAMS:  Just for the record, your Honor, … it is not and was not a ruse, at least to my best knowledge, of my client's actions; and that's based off conversations that in their totality … do not give any impression that there was any ruse.  Furthermore, there was certainly not any instruction by the defendant to create some sort of catastrophe … .

>THE COURT:  That's fine.  And when I said that this was a ruse with the plane reservations, I was not directing that towards you.  You're passing along the information that you got.  Perhaps it would have been the better course for you to have looked at the information before you passed it on to me and made a judgment as to what the impact of it would be on the court, because if you had, you would have seen that he was planning on leaving Wednesday evening for what was supposed to be a four- to five-day trial, and I was told a six- to seven-day trial.  And you'd have seen that there was one hotel room for four adults.  And that certainly would have prompted questions in my mind as to whether Mr. Taylor and the others truly intended to hop on these planes and occupy that hotel room.

>… I don't think you instigated it.  But that's another issue we may have to talk about because if my suspicions are correct, this is an attempt to perpetrate a fraud on the court, to make the court think that plans were in place to be here when, in fact, they weren't.  And that's what is screaming out from the materials that have been presented to me at this point.

The trial progressed, and nothing further—no declaration or affidavit from Taylor or the dental professional, no further evidence of plane or hotel reservations—was presented on Wednesday or Thursday.  After Rainey rested, Williams presented witnesses as part of Taylor's case; his witness, Chris Collins, testified remotely by videoconference from Los Angeles.  At no point during the trial did Williams ask if *Taylor* could appear remotely by videoconference from Los Angeles, a locale where the necessary equipment was readily available.

The issue of Taylor's absence arose once more on Friday, November 18.  After both sides rested, Williams showed the court a reservation for an additional two hotel rooms and airline reservations for Taylor's security personnel; again, Williams did not make those reservations part of the record.  The court stated:

This is a ruse.  And I don't doubt that the reservations were made, because they're here, but first of all, there's been no explanation for why they weren't going to be here on Monday … .  And as we discussed, we could have done opening statements on Monday had voir dire gone quicker.  There's been no explanation as to why Mr. Taylor was going to leave Wednesday night for what his lawyer represented to me last week was going to be a six- or seven-day trial.  There's been no explanation why three rooms would be sufficient for six people.  And again, two of them are a married couple and two of them could share a room, but that still leaves one room short.  There's been no affidavit, even though I've asked for it, … and it was promised to me, no affidavit or declaration from Mr. Taylor that he actually intended to come to Chicago.  There's been no affidavit or declaration from either of the dentists or from Mr. Taylor that he had a true dental emergency on Monday morning.  There's been no explanation of the fact that Mr. Taylor called the dental emergency line on Sunday at 6:00 p.m. and then went out partying all night that evening, which is not what one could be expected to do when suffering dental pain of the severity that would lead to a call to the dental emergency line. … And there's been no affidavit or declaration as to why Mr. Taylor could not have come to Chicago on Tuesday or Wednesday or Thursday or Friday based on a root canal that was done—not dental surgery, a root canal that was done on Monday.

… So, by not informing the court on Sunday, [not] informing his lawyer and disabling his lawyer from informing the court on Sunday, and then when I expressed doubts about what was happening on Tuesday morning, by not giving me the full itinerary—which as I've just explained is wholly insufficient and implausible and a ruse—by not [giving] me the entire itinerary with all the airline reservations and the hotel rooms—the airline reservations to be here for two days, leaving on Wednesday night for [what] at the time the reservation was made they thought … was going to be a six- or [seven]-day trial, [the] insufficient rooms—by not giving that to me until Friday morning, Mr. Taylor has waived any argument that his absence was justified.

… If they were smart about this, they would have actually made reservations that would have corresponded to the expected length of trial.  But as a ruse, this is one of the worst ruses I've ever seen.  It's just completely inept.  I don't know who they think they're trying to fool.  This is ridiculous.

… And that's just the travel component, but every other thing that I talked about on Tuesday, there's been no affidavit, there's been no declaration, even by this morning—we're done with the evidence and we're going to do closing arguments and jury instructions and deliberation.  So, for all those reasons, Mr. Taylor waived whatever argument he might have had, and I don't think he had anywhere near a plausible argument, for why his absence from the trial was justified.

In light of Taylor's absence, the court gave the following jury instruction: "Defendant Jayceon Terrell Taylor was mentioned at trial but did not testify in person in court. You may, but are not required to, assume that Mr. Taylor's testimony would have been unfavorable to Mr. Taylor." Doc. 142 at 18.

On November 18, the jury returned a verdict for Rainey in the amount of $7,130,100—$1,130,100 in compensatory damages, and $6,000,000 in punitive damages. Doc. 139. Judgment was entered on November 21. Doc. 140. On December 14, Taylor filed a notice of appeal. Doc. 144. On December 16, Taylor filed a motion for an extension of time to file post-trial motions. Doc. 149. Later that day, Taylor filed a "Motion for Elimination and/or Reduction (Remittitur) of Damages and Motion for New Trial … Pursuant to Rule 59." Doc. 151.

On December 20, the court denied Taylor's motion for an extension of time to file post-trial motions and denied Taylor's Rule 59 motion without prejudice for failure to comply with Local Rule 5.3(b). Doc. 153. Taylor then filed a supplemented Rule 59 motion, Doc. 158, and moved for reconsideration of the court's denial of his initial Rule 59 motion, Doc. 166. The court granted Taylor's motion for reconsideration; in doing so, the court reinstated Taylor's initial Rule 59 motion, Doc. 151, and explained that the second Rule 59 motion, Doc. 158, would be construed as amending the motion that Taylor timely filed on December 16, Doc. 170. Accordingly, Taylor's post-trial motion is now before the court.

Months after briefing concluded, Taylor submitted two supplemental filings without leave of court. Docs. 186-187. Those materials accordingly will not be considered. That said, the court notes that the first filing, a declaration from Taylor, purports to explain his absence and avers that he did not use his dental issue to avoid trial. Doc. 186. If Taylor (via Williams) had presented that declaration on the first day of trial, or even the second, the court would have

10

considered whether it was truthful and whether it warranted a continuance. Given all the circumstances set forth above, the court likely would have found the declaration untruthful and proceeded with the trial. But even if the declaration had a grain of truth, it was far too little and far too late. The time to prepare and present the declaration was on the first day of trial, and certainly no later than the second, for if a continuance had been granted, the court could have saved the time and effort expended by the jurors, by Rainey and her counsel, by the court and its staff, and by the witnesses over the rest of the week. By waiting until months after the trial, with its highly unfavorable result, to present the declaration, Taylor forfeited whatever argument he could have made based on the declaration.

## Discussion

### I. Jurisdiction

Rainey argues that Taylor divested this court of jurisdiction when he filed his notice of appeal on December 14, 2016, before filing his post-trial motion, thereby leaving the court with no authority to resolve the motion. Doc. 168 at 1. Rainey is incorrect.

Appellate Rule 4(a)(4)(B)(i) states:

> If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

Fed. R. App. P. 4(a)(4)(B)(i). Rule 4(a)(4)(A) encompasses Taylor's Rule 59 motion. *See* Fed. R. App. P. 4(a)(4)(A)(iv), (v). The Advisory Committee Note to the 1993 Amendment of Rule 4(a)(4) states:

> The amendment provides that a notice of appeal filed before the disposition of a specified posttrial motion will become effective upon disposition of the motion. *A notice filed before the filing of one of the specified motions* or after the filing of a motion but before disposition of the motion *is, in effect, suspended until the motion is disposed of*, whereupon, the previously filed notice effectively places jurisdiction in the court of appeals.

11

Fed. R. App. P. 4(a)(4) advisory committee's note to 1993 amendment (emphasis added).

The Note precisely describes Taylor's situation. Thus, Taylor's notice of appeal was "suspended" when he later filed his Rule 59 motion, and this court retains jurisdiction to consider the motion. *Ibid*.; *see Sultan v. Fenoglio*, 775 F.3d 888, 889 (7th Cir. 2015) (citing Rule 4(a)(4)(B)(i) for the proposition that the district court "mistakenly asserted that it could not rule on [the plaintiff's Rule 59] motion because he already had filed a notice of appeal from the dismissal"); *Ross v. Marshall*, 426 F.3d 745, 751-52 & n.13 (5th Cir. 2005) ("[T]he timely filing of a motion listed in Rule 4(a)(4)(A) suspends or renders dormant a notice of appeal until all such motions are disposed of by the trial court. This holds true regardless of whether the motion was filed before or after the notice of appeal."); *United States v. Silvers*, 90 F.3d 95, 98 (4th Cir. 1996) ("Under the 1993 amendments to the Federal Rules of Appellate Procedure, when a party files a timely notice of appeal followed by a timely Rule 59 motion, the notice of appeal is tolled and does not become effective to confer jurisdiction on the court of appeals until the entry of an order disposing of the Rule 59 motion. We agree with Silvers that, based on the language of Rule 4, the district court erroneously concluded that it could not exercise jurisdiction over his Rule 59 motion.") (citation omitted).

## II.  Merits

Taylor's post-trial motions seek a new trial and, in the alternative, a remittitur. In resolving a Rule 59(a) new trial motion, "federal law requires a district court to determine whether the verdict is against the weight of the evidence[,] … the damages are excessive, or … for other reasons, the trial was not fair to the party moving." *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) (second and third alterations in original) (internal quotation marks omitted); *see also Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010)

12

(same).  Taylor's motion for remittitur arises under Rule 59(e).  *See Cooper Indus., Inc. v. Leatherman Tool Grp.*, 532 U.S. 424, 433 (2001) ("[T]he role of the trial judge is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether … remittitur should be ordered.") (internal quotation marks omitted); *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017).  "Altering or amending a judgment under Rule 59(e) is permissible when … there has been a manifest error of law or fact."  *Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006).

## A.    Liability Verdict

Taylor seeks a new trial on the ground that the jury's liability verdict was against the weight of the evidence.  Doc. 158 at 9.  "A plaintiff challenging a jury verdict faces a particularly heavy burden because a court will set aside a verdict … only if no rational jury could have rendered the verdict."  *Moriconi v. Koester*, 659 F. App'x 892, 895 (7th Cir. 2016) (internal quotation marks omitted); *see also Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995) ("[N]ew trials granted because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.").  "When considering whether the jury's verdict goes against the manifest weight of the evidence, a court analyzes the general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial."  *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (internal quotation marks omitted); *see also Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011) (same).  "Jury verdicts deserve particular deference in cases with simple issues but highly disputed facts."  *Moore ex rel. Estate of Grady v. Tuleja*, 546 F.3d 423, 427 (7th Cir. 2008)

(internal quotation marks omitted); *see also Galvan v. Norberg*, 678 F.3d 581, 588 (7th Cir. 2012) ("The district court also has less freedom to overturn a jury verdict in cases involving issues that are easily understood by laypeople.").

The jury's liability verdict here is well-supported by the evidence. Along with twelve other women, Rainey was a contestant on *She's Got Game*. The show followed the contestants as they traveled around the country with Taylor, competing for his affection during group outings and one-on-one dates. As the show progressed, Taylor gradually eliminated contestants, as in *The Bachelor*.

On the evening of May 15, 2015, while *She's Got Game* was filming in Chicago, Rainey and Taylor went on an off-camera outing to a nightclub called Adrianna's Sportsbar. Rainey testified that at the nightclub, when the pair were on a stage in full view of the crowd:

> A:   … [H]e grabs under my skirt hard, like—and grabs. And I go and I turn around, like, "Stop." …  [A]nd he grabs me again. So, I turn around, and I go to push him like this, like I was gonna push him as hard as I could. And I went like this, but as I went like this and I'm [facing] him now, my back is to the crowd. And I go like this, and he grabs me around my back; and he grabs under my butt cheeks and like literally lifts me, like this, whole butt, everything exposed to the crowd, everything.
>
> So, at this point I'm, like, trying to get my arms down and pull my skirt and I'm kind of pushing him and everything at the same time. He lets me go. So, I turn around, and he—it was like—it all happened so quickly. It was like "Okay, boom." Turn around, grabs my boobs and pulls me back. And now he's like juggling my breasts for the crowd, not for his own pleasure, literally for the crowd. Like the light is shining on us and he's literally going like this to my breasts. And then he lets me go. And I go and walk down the stairs, and I walk to the steps. I turn toward the right, and I'm trying to walk ahead of him … . He grabs under my skirt for the third time, and I turn around and I go, "Fucking stop." And he goes, "Shut the fuck up before I eliminate you." …
>
> Q:   Each time that he reached under your dress and grabbed you, where exactly did he grab?
>
> A:   He grabbed my vagina.

14

Paul Smith, a security guard working on *She's Got Game*, testified that he encountered Rainey crying in the hallway of her hotel in the early morning hours of May 16, soon after she returned from Adrianna's.

As shown on video footage from May 18, Rainey confronted Taylor on the show's tour bus about what happened at Adrianna's:

> RAINEY:   Let me tell you what bothered me.
>
> TAYLOR:   Now, what you can do—
>
> RAINEY:   Because what bothered me was real.
>
> TAYLOR:   What you can do is be a woman and shut up, like you can shut up right now. … I said don't mention it.  I said that to your face.
>
> RAINEY:   Right, okay.
>
> TAYLOR:   And you went and mentioned it.
>
> RAINEY:   Right, I mentioned it.
>
> TAYLOR:   So that's the fucking problem.
>
> …
>
> RAINEY:    I left out of there with no panties on.  I had just got done washing my face, and when I got to the club, he grabbed my butt and realized I didn't have no panties on, and he touched my pussy, and then he did it three more times after that … .  That shit bothered me.  I'm not used to no shit like that. So yeah, I spoke about it, man.  Fuck out of here.
>
> TAYLOR:   Fucking psycho.
>
> …
>
> RAINEY:   Why is you mad at me?
>
> TAYLOR:   Get the fuck out of here. … Your pussy ain't no motherfucking (inaudible).
>
> RAINEY:   Who gives a fuck?  It's not for you to touch.
>
> TAYLOR:   Hey, get her the fuck out of here, or y'all gonna regret it.
>
> RAINEY:    It's not for you to touch.  I wanted to talk to you nicely.

15

TAYLOR:   Get the fuck out of here.

…

RAINEY:   I'm trying to talk to you.

TAYLOR:   Fuck off this bus.

RAINEY:   What's wrong with you?

TAYLOR:   Get off this bus before you get your ass strangled. … I'll fucking choke your ass up.

RAINEY:   Would you?

TAYLOR:   Yeah, I would.

Exh. 3 at 12, 16-23 (transcript of the video).  In his videotaped deposition, Taylor denied that he had touched Rainey's private areas, and also denied (though it is very hard to understand how he possibly could have) that Rainey had confronted him on the tour bus.

The only other testifying witness who was at Adrianna's on May 15 was Danny Surrillo, the nightclub's former general manager.  Surrillo testified that he remembered seeing Rainey that night and that he did not see Taylor reach his hand under her skirt.  On cross-examination, Surrillo stated that he had not been served with a subpoena by Rainey's lawyers prior to trial. Immediately thereafter, Gary Olson, the process server hired by Rainey in 2015 and, coincidentally, by Taylor in 2016, testified that Surrillo had recently "confirmed that [he] was the same person that I delivered the subpoena to produce documents [to] back in August of 2015."

By agreement, the jury was instructed:

To prevail on her battery claim against Defendant, Plaintiff has the burden of proving each of the following propositions by a preponderance of the evidence:

First, that Defendant intentionally touched Plaintiff's body;

Second, that the touching was unauthorized by Plaintiff;

Third, that the touching was offensive to Plaintiff;

16

Fourth, that the contact was a proximate cause of injury to Plaintiff.

> If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for Plaintiff. On the other hand, if you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for Defendant.

Doc. 142 at 24.

Whether the jury's verdict was against the weight of the evidence is not a close question. Rainey's testimony alone would have formed a sufficient basis for the verdict. Smith's testimony regarding Rainey's demeanor immediately following the incident, coupled with the video showing Taylor's failure to deny her allegations when she confronted him on the bus, served as unnecessary icing on the cake. Taylor frivolously asserts that Rainey "did not produce a single eye-witness of her own, nor did she produce any witness to controvert Surrillo's testimony." Doc. 172 at 5; *see also* Doc. 158 at 9 (arguing that Surrillo's testimony requires a defense verdict). Rainey's eyewitness was Rainey herself, and the jury was entitled to find that her testimony was credible and that Surrillo's credibility was damaged by the process server's testimony, which plainly revealed that he had lied under oath about the subpoena. On this record, the liability verdict will not be set aside. *See Moriconi*, 659 F. App'x at 895 (affirming the denial of a new trial motion, reasoning that the appellant "cannot establish that the jury's verdict was against the manifest weight of the evidence"); *Moore*, 546 F.3d at 427 (same).

## B.     Damages Verdict

### 1.     Compensatory Damages

Because the jury awarded damages on a state law claim, "[t]he question whether the … award was excessive is controlled by Illinois law." *Smart Mktg. Grp. v. Pubs. Int'l Ltd.*, 624 F.3d 824, 832 (7th Cir. 2010). An award is excessive under Illinois law "if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large

that it shocks the judicial conscience." *Ibid.* (quoting *Best v. Taylor Mach. Works*, 689 N.E.2d 1057, 1079 (Ill. 1997)). The jury's verdict must be given "great deference." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 612 (7th Cir. 2006). "The amount of a verdict is generally at the discretion of the jury," *Baumrucker v. Express Cab Dispatch, Inc.*, 84 N.E.3d 482, 501 (Ill. App. 2017), so long as the jury "has a reasonable basis for its award," *Lee v. Chi. Transit Auth.*, 605 N.E.2d 493, 510 (Ill. 1992). *See Am. Nat'l Bank & Tr. Co. of Chi. v. Reg'l Transp. Auth.*, 125 F.3d 420, 437 (7th Cir. 1997) (same). Accordingly, "a damages award will not be subject to remittitur where it falls within the flexible range of conclusions which can reasonably be supported by the facts … ." *Best*, 689 N.E.2d at 1079 (internal quotation marks omitted).

Taylor contends that the $1,310,100 compensatory damages award was "monstrously excessive" and "had no rational connection" to the evidence. Doc. 158 at 4-6. He is wrong.

The award was based on Rainey's past and future medical expenses, loss of normal life, pain and suffering, and emotional distress. Rainey testified extensively about the emotional distress she experienced from the sexual battery, as well as the medical treatment she sought (and paid for) in its aftermath. Specifically, she testified that, after the assault:

> I was having anxiety, nightmares, and I just was tired all the time and wouldn't talk to nobody. I was crying every day. It was like depression. … I wasn't sleeping, nightmares. I was super anxious because I was afraid … . And I was like having stomach pains, and I wasn't eating. My weight was fluctuating. I didn't have a desire to do anything.

Rainey began seeing a therapist to help her "cope with" the assault and "to try and find a way to be happy again." She described her course of treatment, consisting of therapy and prescribed medications, each with its own benefits and side-effects. Rainey testified that one medication for her depression and anxiety

> made me feel numb, and like I felt like I could just deal with it, like whenever I would see things, it wouldn't bother me as much; but then like I started

> taking a lot of weight, and I started having these things called brain zaps. … It
> feels like electricity, like a bolt of electricity to your brain.

At the time of trial, Rainey was taking three medications and attending therapy sessions, and she

explained that she would continue treatment for "as long as it takes." Her medical records and

medical bills were admitted into evidence. Exhs. 19-22. They showed diagnoses and treatment

consistent with her testimony, Exhs. 19, 21, and that her therapy bills totaled $1,625.00 from

July 1 to August 5, 2015, and $4,434.23 from August 24, 2015 to October 24, 2016, Exh. 22.

Rainey added that Taylor's violent response to her allegations on the tour bus made her

feel "violated, degraded, [and] attacked." And after Rainey filed this suit, Taylor's "non-

acceptance of or ownership of what he did" made her feel attacked once again. Rainey's

testimony focused on one of Taylor's Instagram posts regarding the case. The post, which

depicted Taylor wearing Louis Vuitton boxing gloves, stated in relevant part:

> Let's get one thing very CLEAR: that thirsty Gatorade mascot of a transvestite
> WILL NEVER see $10,000,000 or anything close 2 a penny of my money. …
> Soon as I'm home, me & my lawyers will EAT THIS CASE like a box of
> Minion Twinkies on sale at Walmart ! … She has a history of … other
> "Tranny Panty" activity in her past that makes this false claim irrelevant.
> Don't be fooled by these accusations or the dollar amount in the headlines
> cause I put that on my favorite aunties poodle this broad ain't gettin shit !
> Every girl on that show will tell u I never touched this chick or ever desired to
> be anywhere near her. She got kicked off the show & as a result she filed this
> lame lawsuit which was probably her intentions before the show was ever
> even started. She was begging for my attention the entire time we shot the
> show & was given the ultimate Major League Baseball CURVE ball so that
> upset her & made her lil wee wee hard so she did what all chicks like her do
> when life gives them no other options…. They sue you ! … See you in court
> Mister Rainey.

Exh. 88. Rainey further testified:

> Q:    What did this post do with respect to allowing you to heal from what he
> did?
>
> A:    It made it impossible even to this day.

19

Shana Richardson, Rainey's former business partner, testified as to the changes in Rainey's personality and behavior following the battery. According to Richardson, before the battery, Rainey would

> walk into the room, and it lights up. You know, she just had an air of confidence, really, about herself, very strong, you know, just the classic survivor mode type of person. … The Priscilla that I sent to the show was confident, positive, kind, despite what's being said, a sweetheart that I knew of … .

Rainey and Richardson had been developing a spa business called Luxe Spatique before Rainey left for the show. As Richardson recounted, after Rainey returned home:

> She was super depressed. Like … that's not her. That's not Priscilla. I mean, when you talk about taking someone that's been very confident and then putting her … in that situation, she … was devastated. She was crying. She wouldn't eat. Child done lost weight since I seen her last. I didn't recognize her. … I think the most probably traumatizing part is when she started talking about it, it would always evolve back to that … he's saying he didn't do it. … You know, you see fury, and then you see tears, and then you see pain. But she wasn't who I sent to the show. That was not the same Priscilla … . She's just sad. She's sadder than I've ever known her to be.

Richardson added that Rainey's depression prevented them from proceeding with their business. "[W]ithout Priscilla, there's no Luxe Spatique."

The jury could reasonably have determined that $1,130,100 would fairly compensate Rainey for her past and future medical expenses, loss of normal life, pain and suffering, and emotional distress. The jurors "apparently found [Rainey's] testimony to be sincere and sufficient to convince them that she merited the award they gave her." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016). The jury could have relied on Rainey's testimony alone to reach this result. *See ibid.* ("An award for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress. Juries are responsible for evaluating the credibility of witnesses who testify to emotional distress … .") (internal quotation marks and citation omitted); *cf. Thornton v. Garcini*,

928 N.E.2d 804, 809-10 (Ill. 2010) ("Based on personal experience alone, the jury could reasonably find that the circumstances of this case caused plaintiff emotional distress."). The jury also could have relied on the documentary evidence, including her medical history and therapy bills. Similarly, Taylor's reaction to Rainey's accusations—both during their in-person confrontation on the tour bus and months later on Instagram—give rise to the reasonable inference that Rainey experienced further emotional distress following the battery. Finally, Richardson's testimony reinforced Rainey's account of her trauma and its impact on her mental and emotional health and on her career, and the jury was entitled to rely on that as well. *Cf. Mejia*, 650 F.3d at 633 n.1 (observing that courts applying the "manifest weight" standard owe "a decent respect for the collective wisdom of the jury" and "a certain deference to the jury's conclusions") (internal quotation marks omitted).

Taylor further argues that the compensatory damages award is out of line with awards made in similar cases. It is unclear whether the court must or even can consider such comparisons when evaluating a damages award under Illinois law. *Compare Naeem*, 444 F.3d at 611-12 ("Although making such comparisons is the federal standard for review of compensatory damages, it is not the established methodology employed by Illinois courts. By using such a standard, a district court may allow a larger recovery than would be allowable under Illinois law, or, conversely, it may preclude an award that would be allowable under Illinois law. … Therefore, … in employing this methodology, the district court committed error."); *with Arpin v. United States*, 521 F.3d 769, 776-77 (7th Cir. 2008) (holding that the district court erred by awarding damages in a bench trial without considering awards in similar cases, even though Illinois law "does not require or even encourage such comparisons," because "whether or not to permit comparison evidence in determining the amount of damages to award in a particular case

21

is a matter of procedure rather than of substance, as it has no inherent tendency … either to increase or decrease the average damages award" rather than "merely to reduce variance," and characterizing *Naeem*'s contrary *Erie* analysis as dicta), *and Jutzi-Johnson v. United States*, 263 F.3d 753, 759-60 (7th Cir. 2001) (observing in dicta that a district court awarding damages in a bench trial "should be required" to consider comparable cases because the federal practice of doing so is procedural under *Erie*); *and Fox v. Hayes*, 600 F.3d 819, 845-46 (7th Cir. 2010) (considering comparable cases in determining whether a jury's compensatory damages award on Illinois law claims was excessive, without addressing whether such comparisons are appropriate or required). To the extent the court is permitted or required to consider comparable awards in a case arising under Illinois law, those awards provide additional support for the jury's verdict.

In determining whether the award of compensatory damages was "roughly comparable to awards made in similar cases," *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 833 (7th Cir. 2013) (applying federal law), courts need not "completely analogize the damage award in this case to an identical case with either a similar or dissimilar verdict," *Gracia*, 842 F.3d at 1023 (internal quotation marks omitted). Rather, "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Gracia*, 842 F.3d at 1023 (internal quotation marks omitted).

Taylor's argument on this point consists solely of the perfunctory assertion that "the typical damages award for similar claims is between $200,000 and $499,999" and three case citations that do not come close to supporting the assertion. Doc. 158 at 6 & n.1. Taylor thus has forfeited the point. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks omitted).

22

For her part, Rainey cites several sexual harassment and assault cases in which plaintiffs were awarded compensatory damages greater than $1,130,100. Doc. 168 at 11-12. So even if Taylor had not forfeited the point, and if Seventh Circuit precedent required or allowed the comparison in cases governed by Illinois law, the court would conclude that Rainey's compensatory damages award is roughly comparable to awards made in similar cases. *See*, *e.g.*, *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 77-78 (1st Cir. 2007) (noting that the jury awarded $1,205,000 in compensatory damages to a sexual harassment victim); *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 896, 918 (11th Cir. 2004) (noting that the jury awarded $1 million in compensatory damages to a sexual battery victim); *Pecsi v. Cross*, 2016 WL 3456454, at *1-2 (W.D. Mich. June 2, 2016) (awarding $1,742,448 in compensatory damages in a sexual assault case), *report and recommendation adopted*, 2016 WL 3405871 (W.D. Mich. June 21, 2016).

### 2. Punitive Damages

Taylor argues that the $6,000,000 punitive damages award violates due process. Doc. 159 at 6-9. Punitive damages awards challenged on due process grounds are reviewed under the framework set forth in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).

> In *Gore*, the Supreme Court observed that punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition, but punitive damages violate the Due Process Clause only when an award can fairly be categorized as grossly excessive in relation to these interests. The Supreme Court then instructed courts to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*AutoZone*, 707 F.3d at 838 (internal citations, brackets, and quotation marks omitted).

The first *Gore* guidepost, the reprehensibility of the defendant's conduct, is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. The Supreme Court has instructed district courts to analyze reprehensibility by

> considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). "[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Ibid.*; *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008) ("[T]he consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct.").

The unauthorized touching of a woman's vagina and other intimate areas is a reprehensible act, particularly when done in front of a crowd of onlookers. Under the facts of this case, at least three of the *State Farm* reprehensibility factors are satisfied: the harm Taylor caused was physical; his tortious conduct evinced an indifference to or a reckless disregard of Rainey's well-being; and his behavior was intentional rather than a mere accident. *See State Farm*, 538 U.S. at 419. And although no further justification is necessary, the reprehensibility of Taylor's conduct *following* the battery further justifies the punitive damages award. The court has already reviewed Taylor's vile responses to Rainey's initial effort on the tour bus to discuss the battery ("What you can do is be a woman and shut up"; "Get off this bus before you get your ass strangled"; "I'll fucking choke your ass up"), and to her filing this lawsuit ("other 'Tranny Panty' activity in her past that makes this false claim irrelevant"), which confirm that a punitive damages award is eminently reasonable. It is abundantly clear that Taylor's "culpability, after

having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Ibid*.

As to the second *Gore* guidepost, the ratio between the punitive damages and the actual harm inflicted on the plaintiff, the Supreme Court has declined to set a fixed ratio to limit punitive damages, *see AutoZone*, 707 F.3d at 839, instead observing that "few awards exceeding a single-digit ratio between punitive and compensatory damages … will satisfy due process," *State Farm*, 538 U.S. at 424-25. The Court has implied that higher ratios are acceptable in cases involving physical injury. *See State Farm*, 538 U.S. at 426 (rejecting a 145:1 ratio in part because "[t]he harm arose from a transaction in the economic realm, not from some physical assault or trauma"); *see also Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1272-73 (10th Cir. 2000) (noting that "a greater ratio may be appropriate" for a "primarily personal" injury, such as sexual harassment). In this case, the punitive damages award was approximately six times the compensatory damages award. That ratio is well within the range the Seventh Circuit has approved. *See Gracia*, 842 F.3d at 1025 (approving of a 5:1 ratio and citing cases); *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 676-78 (7th Cir. 2003) (affirming a 37:1 ratio); *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485-86 (7th Cir. 2003) (finding a 9:1 ratio acceptable). Because the court's function is to "police a range, not a point," it "cannot say that the punitive damages in this case are beyond the range of what is acceptable." *Estate of Moreland v. Dieter*, 395 F.3d 747, 757 (7th Cir. 2005) (internal quotation marks omitted).

The court "need not dwell long" on the third *Gore* guidepost, the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases, *State Farm*, 538 U.S. at 428, for Taylor fails to cite any legal authority regarding this factor and thus forfeits any argument he might have had. *See Alioto v. Town of*

*Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … ."); *Judge*, 612 F.3d at 557 ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and brackets omitted). And even if Taylor established that Rainey's award is out of step with civil penalties for analogous conduct, the point would be immaterial. *See May v. Nationstar Mortg., LLC*, 852 F.3d 806, 818 (8th Cir. 2017) ("[T]he absence of comparable civil penalties does not render the punitive damages award unconstitutionally excessive."); *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 237- 38 (3d Cir. 2005) ("[W]e are reluctant to overturn the punitive damages award on [the] basis [of the third guidepost] alone."); *Kemp v. AT&T Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004) (noting that the third guidepost "is accorded less weight in the reasonableness analysis than the first two guideposts"); *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) ("[A]lthough the punitive damages awarded here are more than the damages available under Title VII for analogous conduct, the difference is not enough, by itself, to suggest that the punitive damages award violates due process."); *Swinton v. Potomac Corp.*, 270 F.3d 794, 820 (9th Cir. 2001) (affirming a punitive damages award where only the third guidepost "weigh[ed] in favor of a reduction").

The analysis could very well end here, with the conclusion that consideration of the *Gore* guideposts demonstrates that the $6,000,000 punitive damages award "further[s] [the] State's legitimate interests in punishing unlawful conduct and deterring its repetition." *Gore*, 517 U.S. at 568; *see also AutoZone*, 707 F.3d at 840 (upholding a punitive damages award after considering the *Gore* guideposts); *Estate of Moreland*, 395 F.3d at 758 (same). But the court

26

adds for good measure that two additional points make this an unusually strong case for a large punitive damages award. First, punitive damages are "particularly important in areas such as defamation and *sexual assault*, where the tortfeasor may, if the only price of the tort is having to compensate his victim, commit the tort because he derives greater pleasure from the act than the victim incurs pain." *Kemezy v. Peters*, 79 F.3d 33, 35 (7th Cir. 1996) (emphasis added). And second, the award is highly appropriate due to Taylor's substantial wealth. Doc. 142 at 32 (instructing the jury, pursuant to the Seventh Circuit pattern punitive damage instructions and without objection, to consider the "amount of money [that] is necessary to punish Defendant and discourage him and others from future wrongful conduct in light of his financial condition"); *see also Gore*, 517 U.S. at 591 (Breyer, J., concurring) ("Since a fixed dollar award will punish a poor person more than a wealthy one, one can understand the relevance of [the defendant's wealth] to the State's interest in retribution … ."); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270 (1981) (observing that "evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded"); *Kemezy*, 79 F.3d at 35-36 ("The more wealth the defendant has, the smaller is the relative bite that an award of punitive damages not actually geared to that wealth will take out of his pocketbook, while if he has very little wealth the award of punitive damages may exceed his ability to pay and perhaps drive him into bankruptcy. … [R]ich people are not famous for being indifferent to money, and if they are forced to pay not merely the cost of the harm to the victims of their torts but also some multiple of that cost they are likely to think twice before engaging in such expensive behavior again.").

During discovery, Taylor refused to provide substantive responses to Rainey's interrogatories regarding his net worth. Docs. 104-1, 104-4. Accordingly, the primary evidence

of Taylor's financial condition at trial came from his social media accounts. Here are three examples of posts from his Instagram account, losangelesconfidential:



Exh. 66.



losangelesconfidential                    ...





♥ 138,383 likes

**losangelesconfidential** **@theonlyjmr** told me I had
too many red cars so what I do...... Went out & got
one to match the driveway.... Use to be afraid of

Exh. 72.



**losangelesconfidential**
Bentley Pasadena ›

♥ 72,918 likes

**losangelesconfidential** Fresh outta court.... Went so well today, that boy went & dropped a quarter mill on a Bentley truck !!! Ridin' around bumpin

Exh. 69.

Taylor also posted on Snapchat this Halloween photo of himself sitting on a sofa next to a table covered in cash:



Exh. 82-83.  Those images, like several others shown at trial, depict a tremendously wealthy defendant.  Such a defendant—one who can afford a panoply of red sports cars and a blue one to "match the driveway"; to "drop[] a quarter mil" on yet another luxury car; and to celebrate Halloween accompanied by a table costumed in stacks of cash—is less likely than a defendant of ordinary means to be punished or deterred by a modest financial penalty.  *See Gore*, 517 U.S. at 591 (Breyer, J., concurring); *Kemezy*, 79 F.3d at 35.

The jury reasonably concluded that a lesser financial penalty for Taylor would fail to serve the "legitimate interests" of punitive damages, and that an award of $6,000,000 would be necessary to make him "think twice before engaging in such expensive behavior again." *Kemezy*, 79 F.3d at 35-36.  The punitive damages award was not "grossly excessive in relation to

those interests," and therefore will not be remitted.  *Gore*, 517 U.S. at 568 (internal quotation marks omitted).

### C.    Denial of Continuance Motion and Adverse Inference Instruction

Finally, without citing legal authority, Taylor contends that the trial was unfair to him because the court denied him a continuance and then instructed the jury that it could infer that his testimony would have been adverse to him.  Doc. 158 at 10.  Again, Taylor's slapdash briefing results in forfeiture of the argument.  *See Alioto*, 651 F.3d at 721; *Judge*, 612 F.3d at 557; *Lekas v. Briley*, 405 F.3d 602, 614-15 (7th Cir. 2005) ("While Lekas alleged in his complaint that his segregation was in retaliation for his filing of grievances, he did not present legal arguments or cite relevant authority to substantiate that claim," and "[a]ccordingly, [his] … retaliation claim has been waived.").

Even putting aside forfeiture, Taylor's arguments fail on the merits.  The pertinent facts and circumstances, and the court's assessment of Taylor's excuse for missing trial, are set forth in detail in the Background section above.  To summarize, the court found on multiple occasions that Taylor deliberately failed to appear at trial and then engaged in arguably sanctionable conduct in an effort to disguise that choice as a genuine medical emergency.  Those rulings were informed by the totality of the court's experience with Taylor regularly attempting to subvert this litigation by any means at his disposal.

That is not to say that Taylor's behavior before trial began would have prevented a true medical emergency from warranting a continuance.  But if Taylor had experienced a true medical emergency on the eve of trial, he would have: (1) informed his attorney immediately, rather than two days after he (allegedly) called the emergency dental hotline; (2) quickly provided the court with flight and hotel records that credibly evinced an intention to attend trial

for the entire week, and not just for two days; and (3) prepared and submitted a signed declaration on the first or second (or third) day of trial, supporting his version of the events and confirming his intention to have attended the trial. Taylor would *not* have: (1) spent the night and early morning partying, in a room with flashing lights, after having called the emergency dental hotline; and (2) used his phone to record and post his partying to social media rather than to notify his lawyer of his medical situation. Submitting a declaration months after trial, and even months after post-trial briefing had concluded, was merely the forfeited cherry atop an already iced cake. And the genuineness of the dental emergency is beside the point in light of the evidence, set forth in the Background section, showing that he never intended to attend the trial in the first place. Taylor did not even ask to appear remotely by videoconference, as one of his witnesses did. He has provided no basis to hold that the denial of his motion for a continuance deprived him of a fair trial.

It necessarily follows that the adverse inference instruction given the jury was warranted. As noted, the court instructed the jury with Seventh Circuit Pattern Instruction 1.19: "Defendant Jayceon Terrell Taylor was mentioned at trial but did not testify in person in court. You may, but are not required to, assume that Mr. Taylor's testimony would have been unfavorable to Mr. Taylor." Doc. 142 at 18. The Committee Comments note that the instruction

> should be given only if there is evidence from which the jury could find
> (1) that the missing witness was physically available only to the party against
> whom the inference would be drawn, or (2) that the missing witness has a
> relationship with that party that practically renders the testimony unavailable
> to that party's adversary.

Those conditions were satisfied here because the missing witness, Taylor, *was* the party against whom the inference would be drawn. As the court explained when Taylor initially objected to the instruction:

Mr. Taylor is beyond the subpoena power of the court; but he is a party, and he's physically available only to himself. He could have gotten himself out here if he wanted to. And he certainly—given that he is the Defendant, he has a relationship with himself that renders … his in-court testimony unavailable to the plaintiff. …

And the question is: Could a reasonable jury find that Mr. Taylor's in-court testimony would have hurt him? I think the answer is yes. A jury need not find that Mr. Taylor's in-court testimony would hurt him; but based on everything they've seen, I think a reasonable juror would have ample justification to find that Mr. Taylor's in-court testimony would hurt his case. And that's for any number of reasons, and I'm just going to give three.

One, for purposes of punitive damages, Mr. Taylor would have to answer questions about his net worth. He'd have to explain the Bentleys and Ducatis and the sports cars and the Spyders and the houses and the stacks of cash and all that. And he knew, based on last week's motions in limine, that I had let that in. And I think the jury could conclude … that Mr. Taylor's in-court testimony on that would not have been helpful to him and would have been damaging to him for purposes of that particular component of the punitive damages analysis.

Number two, I think the jury, based on seeing him in the deposition, which was based not on a complete record, and reading his Instagram posts, could conclude—need not conclude, but could conclude—that Mr. Taylor would not have fared very well under cross-examination and would have hurt his case more than he would have helped his case if he actually had to show up in court and answer questions in front of them all.

And … third, among many other reasons why the jury could conclude that his testimony would be unfavorable to him, I think a reasonable juror need not but could believe that Mr. Taylor came off extremely poorly during his deposition and that he would have done the same at trial … . [A defense witness] contradicted many of Mr. Taylor's answers, and I think the jury could conclude that Mr. Taylor didn't show up here because he didn't want to be called on his false deposition testimony. And again, a jury doesn't need to conclude that Mr. Taylor's deposition testimony was false, and they don't need to conclude that even if they believed that the deposition testimony was false, that Mr. Taylor's in-court testimony on those matters would have hurt his case; but a reasonable juror could conclude that, and that's … all that the instruction requires.

Taylor neither acknowledges nor articulates a legal objection to the court's rationale for giving the adverse inference instruction. His motion simply states that "the jury received an adverse jury instruction despite the objections of Defendant's counsel." Doc. 158 at 10. That

statement is correct as a factual matter, but it is not a legally cognizable ground for a new trial under Rule 59(a)—both because it is forfeited and for the same reasons the court stated on the record at trial. *See Alioto*, 651 F.3d at 721; *Judge*, 612 F.3d at 557; *Lekas*, 405 F.3d at 614-15.

One final observation before concluding. It would be natural to harbor some residual doubt that somebody in Taylor's position, with his abundant resources, would voluntarily absent himself from a trial with so much at stake in terms of fortune and reputation—and that doubt in turn might lead to the question whether Taylor actually intended to attend the trial and in fact was stymied by his dental issue. Taylor's conduct during the entire course of this litigation puts to rest those doubts. And even if doubt remained after that, it would be eliminated by Taylor's consistent history of defaults and failures to appear in court, and even for trial, in several other cases. *See The Game: Punching a Cop Cost Me 10 Stacks*, TMZ (Dec. 31, 2015), http://www.tmz.com/2015/12/31/the-game-cop-punch-lawsuit-basketball ("We've learned the rapper just lost a lawsuit filed by Onyebuchi Awaji, an off-duty cop he punched during a dispute on a basketball court in Hollywood in March. … Turns out there was never a trial … Game blew the whole thing off and never responded to the suit so a judge entered a default judgement in the cop's favor. … The jury's out on whether or not Game learned a lesson.") (second ellipsis in the original); *Dream Team Entm't, LLC v. Fifth Amendment Entm't*, No. 3:14-cv-00692-CRS, slip op. at 1-3 (W.D. Ky. Dec. 18, 2015) (entering a $35,000 default judgment against Taylor because, eleven months after being served, he did not respond to a suit alleging that he backed out of a concert at the last minute); Laura Montenegro, *The Game Ordered to Pay Former Nanny $200K in Instagram-Libel Case*, ABC7 (June 29, 2015), https://abc7.com/815995 (reporting on a $200,000 default judgment entered against Taylor "after he failed to respond to the suit"); *White v. Taylor*, 2014 WL 4772247, at *1-2 (Cal. App. Sept. 25, 2014) (noting that Taylor

defaulted by failing to appear, and then obtained vacatur of the default on the condition that he reimburse the plaintiff for attorney fees incurred in obtaining the default); *Hien Nguyen v. Taylor*, 723 S.E.2d 551, 556-61 (N.C. App. 2012) (affirming a $15 million damages award against Taylor, and noting that a liability judgment was entered, and jury trial on damages waived, because he did not appear for the first day of trial); *Rapper The Game a No-Show in Court*, UPI (Mar. 30, 2007), https://upi.com/3577811t (reporting that a New York state judge "issued a warrant for the arrest of rapper The Game after he failed to appear to face charges of impersonating a police officer").

Failing to appear in court, whether for a trial or hearing, whether in a civil or criminal proceeding, is just something Taylor does. And while the court ruled at trial, and reiterated its ruling above, on Taylor's request for a continuance based solely on his conduct in this case, his history of similar behavior in other cases provides confirmation, though none is necessary, that the court's ruling was and remains correct. In retrospect, what Taylor did here was neither an aberration nor a surprise. It was, rather, par for the course.

### Conclusion

Taylor's post-trial motions are denied. The verdict and judgment shall stand.

August 31, 2018

_____
United States District Judge

36